Argued January 24, affirmed February 27, 1957

# KITZKE *v.* TURNIDGE
307 P. 2d 522

564

*Douglas L. Hay*, Salem, argued the cause for appellant. With him on the brief was W. C. Winslow, Salem.

*Bruce W. Williams* argued the cause for respondent. On the brief was Williams & Skopil, Salem.

Before PERRY, Chief Justice, and ROSSMAN, BRAND and McALLISTER, Justices.

ROSSMAN, J.

This is an appeal by the defendant, D. E. Turnidge, from a judgment which the circuit court entered in favor of the plaintiff, J. A. Kitzke, after the jury had returned its verdict in his favor.

The action out of which the challenged judgment arose was based, so the complaint alleges, upon labor of the reasonable value of $2,327.75 which the plaintiff performed at the request of the defendant between January 1, 1952, and October 8, 1952, in the "reconstruction and construction" of a residence owned by the defendant in the Lake Labish area near Salem. The answer admitted that "the plaintiff worked for defendant during the period of time from the 1st day of January, 1952 up to the 8th day of October, 1952" but denied all other averments of the complaint. It alleged that January 1, 1952, the parties entered into an agreement by the terms of which plaintiff agreed to work for the defendant for $200 per month plus ten

cents a pound for all peppermint oil that was produced upon the place which plaintiff was hired to operate and that, in addition, the defendant promised the plaintiff a house in which to live and a garden plot. The answer alleged that all of the work which the plaintiff performed was rendered under that agreement and that all sums earned have been paid except for service after October 1, 1952, and for 125 pounds of peppermint oil. According to further averments, the defendant advanced to the plaintiff $600 for which plaintiff was to account and that the plaintiff is indebted to defendant for five tons of sweet corn.

The reply denied the answer except it admitted that "the plaintiff was to perform certain farm labor for the defendant during the year of 1952 for a sum of $2,400 and was to receive the sum of 10¢ a pound for all peppermint oil produced."

At the conclusion of the trial, the jury returned a verdict in favor of the plaintiff in the amount of $2,229.75 and, based upon it, the challenged judgment was entered.

The appellant (defendant) presents four assignments of error. The first is based upon a ruling which excluded a letter the defendant wrote to the plaintiff November 26, 1952. The second and third are based upon instructions to the jury requested by the defendant but which the trial judge refused to give. The fourth is predicated upon an instruction which was given.

In the latter part of 1951, the defendant, who owns several farms in the Willamette Valley upon which he grows peppermint, purchased a farm in the Lake Labish area upon which there stood a dwelling house that was badly in need of repairs and reconstruction.

When the defendant purchased the place he intended to grow peppermint upon it and secure someone to operate it upon a share-crop basis. The defendant operates his farms through share-crop agreements. The parties had become acquainted with each other sometime before the defendant purchased the Lake Labish farm. The occasion of their acquaintance was the fact that the two had engaged in the joint venture of building a house for sale. In the course of that venture the plaintiff discovered that the defendant owned peppermint farms which he operated through others upon share-crop agreements and told the defendant that he would like to be considered for one of the farms. When the defendant purchased the property he showed it to the plaintiff. As the two inspected it they took note of the fact that the house was unsuitable for occupancy until it received extensive overhauling and that, since the land had not been recently cultivated, it would not yield a satisfactory crop in 1952.

The plaintiff displayed an interest in operating the farm and in performing the work upon the house. The defendant believed that the plaintiff was suitable and that he could perform the needed carpenter work. More than one conference was held between the two while they discussed the matters in hand.

The plaintiff went into occupancy of the property about January 1, 1952, planned the reconstruction work and then, with the defendant's approval, proceeded with the reconstruction of the house. He spent virtually all of January, February, March and April in the reconstruction of the building. In May he gave some of his time to the reconstruction work. Much of the old house was decayed or unsuitable and was destroyed. The ceiling of the remaining part was lowered from twelve feet to eight. A new section was added. The

exterior of the old part was altered materially. All of the old doors and windows were replaced with new ones. The house, when purchased, was lacking in plumbing. The rebuilt house has a bathroom. The plaintiff himself wired the structure. The entire house has a new foundation. The plaintiff supervised the men, four in number, whom the defendant sent to help with the work. He also let the contracts for the plumbing, heating, materials and other phases of the undertaking. The defendant testified that the house cost him over $8,000. Its ground floor contains 1300 square feet. It has a partial second floor.

The record which reveals the above is free from conflict. From there on it takes divergent courses as to the compact under which the parties operated.

The plaintiff claims that he and the defendant formed two agreements. In the one, so he says, he agreed to redesign, supervise and help to reconstruct the old house. He swore that since the defendant had some employees whom he wished to help with the work, he (plaintiff) was given no contract but was to be paid for his work upon the prevalent scale. He testified that in the other agreement he was to operate the farm upon the basis of ten cents per pound for peppermint oil produced upon it, with a guarantee that his minimum would be $2,400. He claimed that when the reconstruction of the house was completed he was to have its occupancy. He said that the sum of $200 which the defendant paid him monthly was not for carpenter wages but was applicable to the guarantee that the peppermint oil would return to him at least $2,400.

The defendant swore that only one agreement was effected in December, 1951, and that it contemplated that the plaintiff should go to work for him upon a total remuneration of (1) ten cents per pound for the

peppermint oil, (2) the use of the reconstructed dwelling house, (3) the use of a garden plot, and (4) $200 per month. According to his version, the plaintiff was required to give the defendant his entire time both as a farmer and as a carpenter. He claimed that if he had ordered the plaintiff temporarily to some other farm it would have been the plaintiff's duty to have gone. Accordingly, the defendant swore that the monthly payments of $200 per month which he made to the plaintiff discharged the entire obligation for carpenter and farm work unless the peppermint crop yielded a sum larger than $2,400 upon the basis of ten cents per pound.

By the early part of May, 1952, the plaintiff had completed his work upon the house and went into occupancy. In the meantime, he had done some farm work. He continued with the latter until the end of October, 1952. While the plaintiff was rebuilding the house, the defendant paid him, not only $200 per month, but also reimbursed him monthly for materials and supplies which he purchased for the reconstruction work. The plaintiff contracted in the defendant's name for the plumbing, heating and other work. The defendant paid the contractor directly for those aspects of the undertaking.

Although in December, 1951, when their relationship began, the parties had hoped that the plaintiff would want to operate the farm in 1953 under a share-crop agreement, it became evident in October, 1952, that they could not agree. Thereupon the plaintiff vacated the house. About that time the plaintiff, for the first time, asked for payment for the carpentry work. The defendant does not concede that a demand for carpenter wages was made even at that time.

November 21, 1952, the plaintiff's attorney sent to

the defendant a letter which detailed the plaintiff's demand for the carpentry work and asked for payment. The letter stated the number of hours of work that had been performed, the charge per hour and the total as $2,327.75. It allowed a credit of $350 which it explained represented the rental value of the house for seven months. November 26, 1952, the defendant wrote a letter to the plaintiff which acknowledged receipt of the attorney's letter and said: "I am going to suggest that we use the Bible way of settling." It explained the suggested method and in support cited Biblical passages. After expounding upon the plan, the letter said: "Now, I am willing to settle this between ourselves" and added, "but if you are not willing to do this" he, the defendant, was prepared to embrace arbitration. The letter cautioned the plaintiff that litigation is costly. We are not sure of what the defendant had in mind, but it is evident that he wished to adjust the differenecs between the parties by a means which would avoid the use of lawyers, legal technicalities and of courtroom strategy. The attorney's letter was received in evidence. The plaintiff's objections to the introduction of defendant's letter were sustained. That ruling constitutes the subject matter of the first assignment of error. The above will suffice as a review of the evidence.

We will now consider the first assignment of error. The letter written by the plaintiff's attorney was received in evidence, not upon the tender of the plaintiff, but upon that of the defendant, who shortly offered in evidence his own letter to the plaintiff which is described in the preceding paragraph. The plaintiff objected to its admissibility upon the ground that it was immaterial to the issues and was composed of self-serving statements. The objections were tentatively

sustained. A moment or two later defendant's counsel asked the plaintiff, "Why didn't you accept the offer to settle out of court as contained in that letter?" meaning defendant's above-described letter. At that point, plaintiff's counsel moved for a mistrial upon the ground that the question mentioned the "compromised offer made by the defendant to the plaintiff in settlement of this particular claim." The motion was denied and thereupon defendant re-offered the letter. The court again tentatively ruled that it was not admissible.

It will be observed that the defendant's letter was dated November 26, 1952. The defendant argues that the plaintiff, by not answering the letter, admitted that its statements were true. But December 1, 1952, six days after the date of the letter, the plaintiff filed the complaint which instituted this action. Evidently he employed his complaint as answer to the defendant's letter. The parties had not engaged in mutual correspondence and defendant's letter to the plaintiff was the first that either had written to the other. Apart from self-serving declarations it assumed largely the form of a plea rather than of a discussion of facts which had become the subject of misunderstanding. Very likely a reply would have called for counterargument and its major subject would have been the merits of settlement out of court.

It is our belief that the defendant's letter contains virtually nothing material to this case, unless the efforts of an alleged debtor to induce his claimant to dispense with lawyers, lawbook law and courtroom litigation is material.

It will be recalled that it was the author of the letter, that is, the defendant himself, who offered it in evidence. When a claimant meets with an offer of com-

promise made by the purported debtor and in subsequent litigation offers the letter in evidence, the courts rule that the offer to compromise is a privileged communication and, therefore, inadmissible. *Blue v. City of Union,* 159 Or 5, 75 P2d 977; *Dalk v. Lachmund,* 157 Or 152, 70 P2d 558; *Wallace v. American Life Insurance Co.,* 111 Or 510, 225 P 192, 227 P 465. In this instance, if the defendant's letter was tantamount to an offer to compromise, the rule of privilege could not have excluded it because, as we have seen, its author was the party that tendered it for admission in evidence. However, when the plaintiff refused to embrace the offer of settling their difficulties made by the letter, he did not thereby admit that his claim was unfounded. Quite the contrary, when he observed that the claim which his attorney had presented met with opposition, he promptly instituted the action at bar. Therefore, there can be no occasion for inferring that the plaintiff conceded the truth of anything contained in the letter. It is our belief that the trial judge committed no error when he sustained the objections. The first assignment of error lacks merit and is rejected.

The second and third assignments of error are based upon requested instructions tendered by the defendant, which were not accepted, and the fourth challenges an instruction which was given. The instruction which was given and the two requested instructions were concerned with the rules that jurors should employ in ascertaining the terms of a contract which emerged from conferences and conversations. We read with care all of the instructions which the trial judge gave to the jury. They pointed out the phases of the case upon which the parties were in accord and those upon which they were in disagreement. The instructions told the jury that they would have to resolve the

issues which arose from the conflicts in the evidence, and outlined the rules and legal principles that the law employs in such instances. The instructions went to unusual pains in so doing and we do not believe that if the verdict is unsatisfactory its nature would have been changed if the instructions had continued to greater length. The issues submitted to the jury were not complex nor were they foreign to the experience of many who own homes or operate farms. Almost everyone who does not seclude himself from active participation in the affairs of life finds himself at sometime or other in an episode somewhat like the one which enveloped these two men in litigation. We think that the instructions gave the jury all of the help which the law books offer for the discharge of its task. And we also believe that the jury should have had no difficulty in understanding the instructions.

■■ We shall single out for particular comment only one of the three assignments of error now under consideration. It is based upon a requested instruction, which reads:

"* * * In order to constitute a contract between the parties, there must be a meeting of the minds of said parties. They must have both understood the situation alike. In this case, if plaintiff understood that he was to be paid extra for this work on the house but the defendant believed and understood that the services so rendered were a part of the general contract of employment which existed between the parties, then and in that case, I instruct you plaintiff has failed to make a case as there was no meeting of minds with reference to this arrangement."

If this requested instruction was intended to say that the mind of the plaintiff and that of the defendant had to meet; that is, that each of the two parties had

to have in mind the same idea and intent before the jury could find that they effected a contract, the instruction if given would have erred. The law of contracts is not concerned with the parties' undisclosed intents and ideas. It gives heed only to their communications and overt acts.

Williston on Contracts, § 22A, says:

"Though assent must be manifested in order to be legally effective, it need not be expressed in words. In the early law of assumpsit stress was laid on the necessity of a promise in terms, but the modern law rightly construes both acts and words as having the meaning which a reasonable person present would put upon them in view of the surrounding circumstances. Even where words are used, 'a contract includes not only what the parties said, but also what is necessarily to be implied from what they said.' And it may be said broadly that any conduct of one party, from which the other may reasonably draw the inference of a promise, is effective in law as such."

Corbin on Contracts, § 19, is to similar effect. That treatise declares:

"Agreement consists of mutual expressions; it does not consist of harmonious intentions or states of mind."

We think that if the requested instruction had been given it could readily have misled the jury. No error was committed when it was rejected.

In this case, it is clear that the parties effected a contract. The plaintiff redesigned and rebuilt the old house. The defendant, who visited the place twice a week, saw him do so and made no objections to his work. The plaintiff also plowed the land, planted a crop, and eventually harvested the latter. The defend-

ant manifested no serious exceptions to the plaintiff's farming work while it was in progress. He contends, as we have seen, that the plaintiff bound himself in December, 1951, to work for him (defendant) not only as a farmer, but also as a carpenter. The plaintiff concedes that in December of 1951 he agreed to perform work as farmer and as carpenter. The defendant, however, claims that the total remuneration, apart from the occupancy of a house and the incidentals of ten cents per pound for peppermint oil and the use of a garden plot, was $200 per month. The plaintiff, upon the other hand, contends that two agreements were made in December, 1951, and that the monthly payment of $200 was not applicable at all to the work which he performed as a carpenter.

It is apparent from the above that the parties were agreed that they had actually effected some sort of understanding whereby the plaintiff bound himself to farm the land and rebuild the old house. The principal issue between them was: how much did the defendant bind himself to pay? That issue did not so much call for an instruction upon a meeting of the minds as for the rules which govern the burden of proof and the interpretation of words spoken by parties while negotiating a contract. We believe that the instructions which were given to the jury were adequate to those purposes. They were couched in terms which no juror should have had difficulty in understanding. We find no merit in the three assignments of error under consideration.

The challenged judgment is affirmed.